J-A03011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| STACY BRITTON | : | |
| | : | |
| Appellant | : | No. 1786 EDA 2017 |

Appeal from the Judgment of Sentence January 6, 2017
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0002192-2015

BEFORE: GANTMAN, P.J., McLAUGHLIN, J., and PLATT*, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED MARCH 06, 2018**

Appellant, Stacy Britton, appeals from the judgment of sentence entered in the Monroe County Court of Common Pleas, following her jury trial convictions for first-degree murder, criminal conspiracy, perjury, and hindering prosecution.[1] We affirm.

In its opinions, the trial court fully and correctly set forth the facts and procedural history of this case. Therefore, we have no reason to restate them.

Appellant raises the following issue for our review:

> WHEN AN APPELLANT'S RECORDED STATEMENT IS OBTAINED AS A RESULT OF THE PENNSYLVANIA STATE POLICE SENDING A CALIFORNIA DETECTIVE INTO THAT

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 903(c), 4902(a), 5105, respectively.

_____

* Retired Senior Judge assigned to the Superior Court.

APPELLANT'S CALIFORNIA HOME TO SURREPTITOUSLY RECORD THAT APPELLANT, SHOULD THE RECORDED STATEMENT BE SUPPRESSED EVEN IF CALIFORNIA LAW WOULD HAVE ALLOWED SUCH SURREPTITIOUS RECORDING?

(Appellant's Brief at 6).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Margherita Patti Worthington, P.J., we conclude Appellant's issue merits no relief. The trial court opinions comprehensively discuss and properly dispose of the question presented. (**See** Trial Court Opinion, dated October 27, 2016, at 1-37; Suppression Trial Court Opinion, dated May 8, 2017, at 1-13) (finding: initially, no Pennsylvania state interest would be advanced by analyzing propriety of surreptitious recording of Appellant under Pennsylvania law because recording did not occur in Pennsylvania and interviews were not conducted by Pennsylvania law enforcement; California legislature enacted laws to permit law enforcement officers to record individuals without prior court approval; while Pennsylvania Wiretap Act would not allow similar police conduct, Pennsylvania has no interest in interview recordings conducted in California, even if results are later used in Pennsylvania proceedings; Pennsylvania Superior Court has already decided that if legislature of another state allows wiretapping within its borders, Pennsylvania courts will not question that decision; thus, California law controls and court must determine whether recordings at issue were valid, legal, and properly

authorized under California law; conduct of California detectives constituted "eavesdropping" and did not constitute "wiretapping" as defined in California Penal Code; interviews at issue were conducted on 8/17/15 and 8/18/15, at police station and Appellant's residence, by video or audio; California legislature recognizes that law enforcement agencies have legitimate need to employ modern listening devices and techniques in investigation of criminal conduct; because California detectives were acting within scope of their authority as law enforcement officers, they were permitted to record Appellant surreptitiously, without asking for consent prior to recording, under California law; additionally, California law allows one party to confidential communication to record communication for purposes of obtaining evidence reasonably believed to relate to commission by another party to communication of crime of any felony involving violence; thus, even if California detectives were somehow not acting within scope of their authority as law enforcement officers, recordings at issue would still be valid under California law; moreover, even if recordings were suppressed, California detectives were direct parties to communications at issue and could testify to their recollections of interviews; Appellant also insists California detectives were acting as agents of Pennsylvania state police and therefore must conform to Pennsylvania law; Appellant failed to cite any legal authority in her suppression motion to support this position; in any event, evidence does not support Appellant's contention, where Pennsylvania

police did not ask California detectives to record Appellant's interviews or instruct California detectives how to conduct interviews; rather, California detectives recorded Appellant's interviews pursuant to California law and California police department standard practices). Accordingly, we affirm based on the court's opinions.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/18

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : **NO. 2192 CR 2015** |
| | : |
| **vs.** | : |
| | : |
| | : |
| **STACY BRITTON,** | : |
| **Defendant** | : **Omnibus Pretrial Motion** |

### OPINION

This matter comes before the Court on Stacy Britton's ("Defendant") Omnibus Pretrial Motion. The procedural history and facts according to the Commonwealth are as follows:

On July 7, 2002, human remains were found on a property near North Road in Jackson Township. The body had been dismembered and burned in two (2) 55 gallon drums. A forensic examination of the remains was conducted and it concluded that the cause of death was multiple stab wounds and blunt force trauma to the head and torso. In addition, the examination determined that the victim's head, hands, and legs were amputated postmortem. In 2003, the victim was identified as Robert Roudebush ("Victim'), a 46 year old male from Wilkes-Barre who had not been seen since late June or early July of 2002.

At the time of the Victim's death, Defendant lived with her husband, James Britton, in Wilkes-Barre, Luzerne County, Pennsylvania. On August 24, 2002, their home in Wilkes-Barre burned down and was later ruled an arson. Shortly thereafter, the couple relocated to California and continued to reside there until their arrests in 2015.

On November 14, 2003, James Britton, who was incarcerated on an unrelated charge, informed his probation officer, and later Pennsylvania State Police, that he had information about

1

a murder from July 2002 concerning a person named Bob who was burned in a barrel. James Britton stated that Larry Tooley, their next door neighbor in Wilkes-Barre, committed the murder.

In 2008, Defendant was subpoenaed to testify before the Monroe County Investigative Grand Jury. On November 21, 2008, Defendant testified, under oath, that Tooley threatened both her and James Britton. Defendant also stated that Tooley told them that they would end up like Bob, which included being burned.

On August 14, 2015, Defendant contacted Detective Joseph Coddington ("Detective Coddington") of the Monroe County District Attorney's Office and implicated her ex-husband, James Britton, in the Victim's murder. Defendant was subsequently interviewed by Detective Jon Cahow ("Detective Cahow") and Detective Chuck Phillips ("Detective Phillips") of the San Bernardino Sheriff's Department Homicide Unit. Defendant indicated that the Victim was killed because he stole money and drugs from them and that James Britton devised a plan to murder the Victim, which they both rehearsed beforehand. According to Defendant, the murder occurred on July 4, 2002 at their residence in Wilkes-Barre where she was present and participated in a struggle with Victim. Defendant stated that they used knives and a hammer in the assault. After they killed the Victim, Defendant indicated that she helped moved the body into the basement and, a few days later, she dismembered the Victim's head, hands, and legs. Defendant told police that she packaged the body parts in black trash bags and both she and James Britton transported the bags to Jackson Township in Monroe County, where James set the bags on fire.

On August 27, 2015, Defendant was charged by Criminal Complaint with Criminal Homicide[1], Conspiracy – Criminal Homicide[2], Tamper With/Fabricate Physical Evidence[3],

---

[1] 18 Pa.C.S.A. § 2501 (a)
[2] 18 Pa.C.S.A. § 903(c)

2

Abuse of Corpse[4], Perjury[5], False Swearing – Official Proceeding[6], False Swearing – Mislead Public Servant[7], and Hinder Apprehension/Prosecution – Conceal/Destroy Evidence[8]. On October 16, 2015, a preliminary hearing was held before MDJ Mancuso and all charges were held for disposition in the Court of Common Pleas.

On November 23, 2015, the Commonwealth filed a Criminal Information which included all the aforementioned charges except for False Swearing – Mislead Public Servant.

On January 20, 2016, the Commonwealth filed notice that Defendant's case is joined for trial with *Com. v. James Britton*, 2913 CR 2015.

On April 29, 2016, Defendant filed an Omnibus Pretrial Motion. Defendant's Omnibus Pretrial Motion specifically addressed the following: (1) Motion to Suppress Statements; (2) Motion to Establish Dates for Disclosure of Grand Jury Testimony of Commonwealth Witnesses; (3) Motion to Suppress Search of South Carolina Storage Facility; (4) Motion to Dismiss for Violation of Statute of Limitations; (5) Motion for Improper Venue; (6) Motion for Individual Voir Dire; and (7) Motion for Use of Jury Questionnaire.

A hearing on Defendant's Omnibus Pretrial Motion was held on July 12, 2016. At said hearing, We heard testimony from members of law enforcement and James Britton, Sr., as well as arguments from counsel. We directed defense counsel to file a brief within 14 days from the filing of the hearing transcript and counsel for the Commonwealth to file a brief 14 days

---

[3] 18 Pa.C.S.A. § 4910(1)
[4] 18 Pa.C.S.A. § 5510
[5] 18 Pa.C.S.A. § 4902(a)
[6] 18 Pa.C.S.A. § 4903(a)(1)
[7] 18 Pa.C.S.A. § 4903(a)(2)
[8] 18 Pa.C.S.A. § 5105(a)(3)

3

thereafter. The hearing transcript was filed on August 9, 2016. We received defense counsel's brief on August 29, 2016 and the Commonwealth's brief on September 21, 2016.[9]

After review of the record, argument at the hearing, and counsels' briefs, We are ready to dispose of Defendant's Omnibus Pretrial Motion.

## DISCUSSION

### 1. *Motion to Suppress Statements*

#### A. *Surreptitious Recordings*

Defendant avers that, because California law enforcement officials recorded Defendant without prior approval of a neutral magistrate, her statements during the interviews must be suppressed. Def.'s Br., pp. 3-6. Before addressing this issue, We must determine whether to apply Pennsylvania or California law.

In conflicts cases involving procedural matters, Pennsylvania will apply its own procedural laws when it is serving as the forum state. *Com. v. Sanchez*, 716 A.2d 1221, 1223 (Pa. 1998). Procedural law is "that which prescribes the methods of enforcing rights or obtaining redress for their invasion; as distinguished from the substantive law which gives or defines the right." *Id.* at 1224 (citing Black's Law Dictionary 1429 (6th ed. 1990)). In cases where the substantive laws of Pennsylvania conflict with those of a sister state in the civil context, Pennsylvania courts take a flexible approach which permits analysis of the policies and interests underlying the particular issue before the court. *Id.* at 1223 (citations omitted). "This approach gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context, thereby allowing the forum [court] to apply the policy of the jurisdiction most intimately concerned with the outcome." *Id.* at 1223-24 (citations

---

[9] Defense counsel's brief was due by August 23, 2016 and the Commonwealth's brief was due by September 12, 2016. Neither party filed a motion requesting a time extension.

4

omitted). The Pennsylvania Supreme Court held that a similar approach should be taken in the criminal context as well. *Id.* at 1224. A substantive right is "a right to equal enjoyment of fundamental rights, privileges, and immunities; distinguished from a procedural right." *Id.* (citing Black's Law Dictionary 1429 (6th ed. 1990)).

Instantly, the issue that We must address is whether Pennsylvania or California law should be used to determine whether the surreptitious recordings of Defendant's interviews by the San Bernardino Sheriff's detectives were conducted through valid and legal means. This issue is a constitutional law question involving the fundamental right to be free from unreasonable searches and seizures. Thus, it must be addressed under the principles of conflict between substantive laws, which require this Court to evaluate which state has the most interest in the outcome. *See Sanchez*, 716 A.2d at 1224.

Defendant's interview took place in California and involved the questioning of a California resident. While Pennsylvania has an interest in protecting its citizens from police misconduct and wiretap violations, the courts of this Commonwealth have no power to control the activities of a sister state or punish conduct occurring within that sister state. *See Sanchez*, 716 A.2d at 1224. No Pennsylvania state interest would be advanced by analyzing the propriety of the surreptitious recordings of Defendant under Pennsylvania law because it did not occur in Pennsylvania and the interviews were not conducted by Pennsylvania law enforcement.[10] The California state legislature enacted laws that permit law enforcement officers to record individuals without prior court approval.[11] While it is true that the Pennsylvania Wiretap Act[12] would not allow similar police conduct, We will not question that decision under the conflicting

---

[10] Defendant avers that the San Bernardino Sheriff's Department were acting as agents to Pennsylvania law enforcement. Def.'s Br., pp. 6-8. We will discuss this argument *infra*.
[11] *See* Cal. Penal Code §§ 633, 633.5.
[12] 18 Pa.C.S.A. § 5701, Et. seq.

5

decisions of Pennsylvania because Pennsylvania has no interest in interview recordings that were conducted within California's borders, even if the results are later used in a Pennsylvania court proceeding.

Furthermore, Our Superior Court has held that if the legislature of another state determines that wiretapping will be permitted within its borders, Pennsylvania courts will not question that decision. *Com. v. Bennett*, 369 A.2d 493, 494-95 (Pa. Super. 1976). In reaching its conclusion, the *Bennett* court stated:

> It cannot be denied that the Pennsylvania anti-wiretapping statutes proscribe certain activities and declare illegal the evidence obtained from those specified activities within the borders of this Commonwealth. However, nowhere in these legislative enactments are we able to find, either specifically or by inference, a legislative mandate that extends to the activities[13] before us. The legislature, by the enactment of these statutory proscriptions, has clearly spoken its intention. It is the duty of the courts of this Commonwealth to interpret and enforce that intention. It is not, however, a part of the judicial function to extend and amend the legislation here involved by drafting an amendment to that legislation which declares [a]ll wiretap information and evidence secured thereunder illegal [w]herever and [h]owever it may be obtained. Had the legislature so intended, it would have been a matter of no difficulty, by the use of a few simple words of English, to do [sic] declare it.

*Id.* at 494. Therefore, the court concluded that "that the use in this Commonwealth of information secured through a valid, legal, properly authorized wiretap in a foreign jurisdiction is not in contravention of the Pennsylvania anti-wiretapping statutes, and that the evidence seized in Pennsylvania under such a warrant is admissible." *Id.*

Accordingly, We must determine whether the surreptitious recordings of Defendant's interviews by California law enforcement were a valid, legal, properly authorized recording under California law. Cal. Penal Code § 631 ("Section 631") provides that it is illegal for any person to tap or make any unauthorized connection with any telephone line, etc. Cal. Penal Code

---

[13] In *Bennett*, a New Jersey judge authorized a wiretap on a telephone terminal located within New Jersey. Information gathered from that wiretap was later used by Pennsylvania State Police to apply for a search warrant of the defendant's Pennsylvania residence.

6

§ 631. Cal. Penal Code § 632 ("Section 632") provides that it is illegal for any person to eavesdrop on any confidential communication by means of any amplifying or recording device. Cal. Penal Code § 632. Although both sections envision and describe the use of similar equipment to intercept communications, the manner in which the equipment is used is clearly distinguished, separate, and mutually exclusive. *People v. Ratekin*, 261 Cal.Rptr. 143, 145 (Cal. Ct. App. 1989). Section 631 prohibits "wiretapping," which is intercepting communications by an unauthorized connection to the transmission line. *Id.* Section 632 prohibits "eavesdropping," which is interception of communications by the use of equipment which is not connected to any transmission line. *Id.* Instantly, the conduct of the San Bernardino Sheriff's detectives constituted "eavesdropping" as described in Section 632 and did not constitute "wiretapping" as described in Section 631. The interviews at the San Bernardino Sheriff's Department Morongo Basin Station ("Morongo Station") and Defendant's residence on August 17-18, 2015 were either video or audio recorded. Com.'s Ex. 1, p. 1.

Section 632 makes it illegal to eavesdrop on a "confidential communication," which includes:

> [A]ny communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

Cal. Penal Code § 632(c). Except as proof in a prosecution for violation of Section 632, no evidence obtained as a result of eavesdropping is admissible in any court proceeding. Cal. Penal Code § 632(d). Consequently, unless an exception exists, the audio and video recordings of Defendant's interviews must be suppressed. It should be noted, however, that even if a recording is suppressed under Section 632, California law allows testimony as to the content of an illegally

7

recorded conversation, to the extent that the witness enjoys an untainted recall of the conversation. *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th Cir. 2003) (citations omitted). "Nothing in the Privacy Act can be read . . . to conclude a party whose confidential communications have been recorded gains greater protection than if they had not been so intercepted." *Frio v. Superior Court*, 250 Cal.Rptr. 819, 826 (Cal. Ct. App. 1988). Additionally, a witness is not precluded from using an illegally recorded conversation or accompanying report to refresh his or her recollection, so long as neither is read into evidence. *Id.*

Thus, Defendant's request that we suppress her statements made during the August 17-18, 2015 interviews, in their entirety, is unsupported by California law. Even if the recordings were suppressed, Detectives Cahow and Phillips, who were direct parties to the communications, could testify to their recollections of the interviews. In light of this, We will now address whether the audio and video recordings themselves are admissible.

Cal. Penal Code § 633 ("Section 633") gives law enforcement officers the ability to record conversations when acting within the scope of their authority:

> Nothing in Section [632] . . . prohibits . . . any chief of police, assistant chief of police, or police officer of a city or city and county, any sheriff, undersheriff, or deputy sheriff regularly employed and paid in that capacity by a county, . . . or any person acting pursuant to the direction of one of these law enforcement officers acting within the scope of his or her authority, from overhearing or recording any communication that they could lawfully overhear or record prior to the effective date of this chapter.
>
> Nothing in Section [632] . . . renders inadmissible any evidence obtained by the above-named persons by means of overhearing or recording any communication that they could lawfully overhear or record prior to the effective date of this chapter.

Cal. Penal Code § 633. In explaining its exception for law enforcement officers, the California Legislature stated:

8

> The Legislature recognizes that law enforcement agencies have a legitimate need to employ modern listening devices and techniques in the investigation of criminal conduct and the apprehension of lawbreakers. Therefore, it is not the intent of the Legislature to place greater restraints on the use of listening devices and techniques by law enforcement agencies than existed prior to the effective date of this chapter.

Cal. Penal Code § 630.

Instantly, Detectives Cahow and Phillips are employed by the San Bernardino Sheriff's Department Homicide Unit. N.T. 7/12/16, pp. 20, 26. Therefore, they fall within the definition of "law enforcement officers" pursuant to Section 633. When the detectives interviewed Defendant at the Morango Station and her residence on August 17-18, 2015, they were well within the scope of their authority as members of the San Bernardino Sheriff's Department. Therefore, Detectives Cahow and Phillips were permitted to surreptitiously record Defendant's interviews and were not required to ask for her consent prior to recording.

Nonetheless, even if Section 633 were inapplicable to the facts of this case, California law allows one party to a confidential communication to record the communication for the purposes of obtaining evidence in limited situations:

> Nothing in Section [632] . . . prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of . . . any felony involving violence against the person[.] . . . Nothing in Section [632] . . . renders any evidence so obtained inadmissible in a prosecution for . . . any felony involving violence against the person . . . or any crime in connection therewith.

Cal. Penal Code § 633.5.

Defendant is charged with Criminal Homicide and several other offenses that are related to the Victim's murder. Even if Detectives Cahow and Phillips were not acting within the scope of their authority as law enforcement officers at the time of Defendant's interviews, the audio and video recordings would still be admissible at trial under Section 633.5.

9

Defendant also argues that Detectives Cahow and Phillips, at the time they surreptitiously recorded her during the August 17-18, 2015 interviews, were acting as agents of the Pennsylvania State Police and therefore, those agents must conform to Pennsylvania law. Def.'s Br., pp. 6-7. Defendant failed to cite to any legal authority to support this position. After careful review, We do not find any Pennsylvania authority that would support Defendant's argument. Other jurisdictions have addressed this issue. The Washington Supreme Court determined that Washington's Privacy Act did not apply to a defendant's statements taken by California police and recorded without the defendant's consent because the California police were not "agents" of Washington. *State v. Brown*, 940 P.2d 546, 584-91 (Wash. 1997).

In *Brown*, Brown made statements during interviews with California detectives in connection with a body found near the Seattle-Tacoma Airport in Washington. *Id.* at 555. These interviews were recorded by police without Brown's knowledge. *Id.* Brown was later charged and convicted in Washington with Aggravated Murder in the First Degree and sentenced to death. *Id.* at 558-559. One of the issues raised on direct appeal was whether Brown's statements to California police, which were recorded without his knowledge as permitted by California law, violated Washington's Privacy Act and, thus, inadmissible in Washington courts. *Id.* at 583. The court came to the preliminary conclusion that whether Brown's recorded confessions should be suppressed depends on whether the California police were "agents" of Washington. *Id.* at 588. In answering this, the pertinent question was whether Washington police cooperated and helped California police so extensively that the latter did not "independently" obtain Brown's statements. *Id.* at 589. The court found that Washington police contacted the California police and asked them to get a statement from Brown but did not tell them what to ask or how to conduct the interview. *Id.* at 589. The California police lawfully and independently recorded the

10

statements under California law and, therefore, the statements were admissible at trial even though similar police conduct in Washington would have violated the Washington Privacy Act. *Id.* at 590.

In the present case, Defendant contacted Detective Coddington of the Monroe County District Attorney's Office on August 14, 2015 to speak about the Victim's murder. N.T. 7/12/16, pp. 9-10. During that conversation, Defendant said she would rather speak to someone in person. *Id.* at 15. Detective Wendy Serfass ("Detective Serfass") then passed along that information to the Pennsylvania State Police. *Id.* at 15-16. Corporal Thomas McAndrew ("Corporal McAndrew"), a member of the Pennsylvania State Police, subsequently contacted the San Bernardino Sheriff's Department Homicide Unit and spoke with Detective Cahow. *Id.* at 134-35. During that phone conversation, Detective Cahow testified that Corporal McAndrew gave him background information on the case and asked if he could meet with Defendant to interview her. *Id.* at 59. Detective Cahow also testified that Corporal McAndrew did not ask him to record Defendant's interviews. *Id.* at 60. Further, Corporal McAndrew testified that he did not instruct Detective Cahow how to conduct the interviews. *Id.* at 147-48. Instead, Detective Cahow recorded Defendant's interviews pursuant to California law and his department's standard practice. *Id.* at 60.

We are persuaded by the reasoning in *Brown* and find that members of California law enforcement did not act as "agents" of Pennsylvania, but rather conducted Defendant's interviews in accordance with Sections 633 and 633.5 of the California Penal Code, as well as the standard practice of the San Bernardino Sheriff's Department Homicide Unit. Corporal McAndrew gave Detective Cahow background information surrounding the Victim's death so that Cahow had the necessary information to interview Defendant. Both Corporal McAndrew

11

and Detective Cahow testified credibly that their conversations did not include instructions on how to conduct the interviews.

For the reasons stated above, We find that California law enforcement properly recorded Defendant's August 17-18, 2016 interviews.

*B. Miranda Warnings*

Defendant avers that her August 17-18, 2016 interviews must also be suppressed because she was "in the functional equivalent of custody and was not read her *Miranda*[14] rights." Def.'s Br., p. 8-9. More specifically, Defendant argues that, while she was permitted to leave at the end of each interview, a reasonable person would not believe that she was free to leave. *Id.* at 8. The Commonwealth responds that Defendant was not in custody until she was placed under arrest in Pennsylvania and, during the August 17-18, 2016 interviews in California, Detectives Cahow and Phillips repeatedly advised Defendant that she was not under arrest, did not need to answer questions, and could terminate the interviews at any time. *Id.* at 14-15.

We must first determine whether Pennsylvania or California law applies to this issue. Under Pennsylvania choice of law analysis, the first step is to determine whether the laws of the competing states actually differ. *Carbis Walker, LLP v. Hill, Barth & King, LLC*, 930 A.2d 573, 578 (Pa. Super. 2007) (citations omitted). If the laws do not differ, there is no conflict, no further analysis is necessary, and the court must use Pennsylvania law. *Id.* (citations omitted).

Pennsylvania courts have held that, for *Miranda* rights to attach to a police encounter, there must be both custody and interrogation. *Com. v. Turner*, 772 A.2d 970, 973 (Pa. Super. 2001). "Custody" is defined as a detention where "the person is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted[.]" *Com. v. Williams*, 650 A.2d

---

[14] *Miranda v. Arizona*, 384 U.S. 436 (1966)

12

420, 427 (Pa. 1994). Stated another way, a police detention becomes custodial when it becomes so coercive, it constitutes the functional equivalent of an arrest. *Com. v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999) (citations omitted). The standard for determining whether the police encounter is deemed "custodial" is an objective one based on the totality of the circumstances. *Mannion*, 725 A.2d at 200 (citations omitted).

Similarly, California courts have held that an interrogation is custodial, for purposes of requiring advisement under *Miranda,* when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *People v. Moore*, 247 P.3d 515, 524 (Cal. 2011) (quoting *Miranda*, 384 U.S. at 444). "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (citations omitted). "Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest." *People v. Linton*, 302 P.3d 927, 947 (Cal. 2013) (citations omitted).

After careful review, We find that both Pennsylvania and California law regarding "custodial interrogation" for purposes of *Miranda* do not differ. Consequently, there is no conflict and Our choice of law analysis ends. We will now proceed with Defendant's issue under Pennsylvania law.

Among the factors a court utilizes in determining, under the totality of the circumstances, whether a police detention becomes so coercive as to constitute the functional equivalent of a formal arrest are: "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods

13

employed to confirm or dispel suspicions." *Mannion*, 725 A.2d at 200 (citations omitted). "The fact that a police investigation has focused on a particular individual does *not* automatically trigger 'custody,' thus requiring *Miranda* warnings." *Id.* (citations omitted) (emphasis in original). Instead, it is just another relevant factor in the court's determination. *Com. v. Peters*, 642 A.2d 1126, 1130 (Pa. Super. 1994).

On August 17, 2016 at approximately 3:30 p.m., Detective Cahow called Defendant. Com.'s Ex. 2. Detective Cahow told her that they received a phone call from Pennsylvania investigators and asked if she could come to the Morongo Station and speak with them. *Id.* Detective Cahow also told her that she was not in trouble and they are not arresting her. *Id.* Defendant agreed to come speak with them and asked if they could come pick her up from her home with an unmarked police vehicle because she did not have a driver's license and also did not want the neighbors to see a police vehicle. *Id.* Detective Cahow agreed and told Defendant that he will pick her up shortly. *Id.*

At approximately 4:05 p.m., Detectives Cahow and Phillips arrived at Defendant's home and drove her and her son, Jesse, back to the Morongo Station. Com.'s Ex. 2. Defendant went into an interview room with the detectives while a patrol deputy watched Jesse. N.T. 7/12/16, p. 28. Detective Cahow testified that he sat first chair, which means he was sitting with Defendant, while Detective Phillips stayed in the background to take notes. *Id.* First, Defendant acknowledged that she initiated contact with law enforcement. Com.'s Ex. 2. Detective Cahow testified that they then gave Defendant what he referred to as a "Beheler[15] Admonishment." *Id.*

---

[15] *California v. Beheler*, 463 U.S. 1121, 1125 (1983)

at 29-30. The audio recording shows that the detectives and Defendant then engaged in the following exchange:[16]

> Detective Phillips: You understand that you are not under arrest or anything like that.
> Defendant: Yeah, I understand that.
> Detective Phillips: You're here on your own free will. You're not being detained.
> Defendant: I'm going to tell you all the bad things that I did regarding ::inaudible:: and then Jim's.
> Detective Cahow: You understand though ma'am that you're not under arrest and you can leave here anytime you want.
> Defendant: Right.
> Detective Cahow: Ok. I need you to understand that.
> Defendant: Ok. And can I ask you honestly. Depending on what I tell you, is there a possibility that you won't let me go back to the house?
> Detective Cahow: No ma'am.
> Detective Phillips: That's not possible.
> Detective Cahow: That's not possible. You are going home. Ok? One-hundred percent.
> Defendant: Ok because the animals ::inaudible:: by themselves.
> Detective Phillips: And you have a son to take care of and that's important to us.
> Defendant: Well I know you would put him in foster care ::inaudible::.
> Detective Phillips: No, no, no.
> Detective Cahow: That's not happening today.
> Defendant: Ok. So I am here on my own free will. I came forward. I want to talk.
> Detective Cahow: Ok.
> Defendant: I want -- I want the entire -- anybody that will listen to know everything about James Britton.

Com.'s Ex. 2.

At approximately 7:30 p.m., Detective Cahow stopped the interview to give Defendant a break. *Id.* At approximately 8:05 p.m., when Detective Cahow reinitiated the interview, he reminded Defendant that she is not under arrest, she is going home, she is not obligated to talk to them, and the door to the interview room is closed only for privacy purposes. *Id.* Defendant acknowledged that she understood. *Id.* At approximately 8:34 P.M., Defendant asked if she

---

[16] The audio CD of the interview with Defendant is difficult to interpret, as some aspects of the interview are mumbled or poorly recorded. This description of the exchange is based on the Court's best interpretation of the tape.

15

could go home to get Jesse ready for bed. *Id.* The detectives agreed and asked if they could continue the interview at her house. *Id.* Defendant responded, "Yeah, I really don't care. You can park your undercover in the garage and we can sit at the table." *Id.* The detectives then drove Defendant and Jesse back to their residence and, after Defendant got Jesse ready for bed, continued the interview. *Id.* The interview concluded at approximately 10:30 p.m. and Defendant invited the detectives to come back the following day to continue their conversation. *Id.*

On August 18, 2016 at approximately 12:40 p.m., Detectives Cahow and Phillips arrived at Defendant's residence to continue the interview. Com's Ex. 4. During the interview, Defendant agreed to call James Britton to try to get him to talk about the Victim's murder. *Id.* Prior to attempting to call James Britton, Detective Cahow again reassured Defendant that they are not taking her away and they are going to leave her at the house after the interview is complete. *Id.* At approximately 5:26 P.M., the detectives concluded the interview and asked Defendant to complete some sketches, i.e. location of the Victim's body in the kitchen and the basement. *Id.* Defendant and the detectives agreed that they would return in about an hour to get the sketches and also video a demonstration by Defendant as to how James Britton stabbed the Victim. *Id.* After the detectives returned to retrieve the sketches and video the demonstration, they left and Defendant remained at the residence. Defendant remained free until her arrest on August 28, 2015 at the Philadelphia International Airport.

After a review of the record, We find no evidence to indicate that Defendant was "in custody" during her interviews with Detectives Cahow and Phillips on August 17-18, 2016. We find no evidence to suggest that the detectives deprived Defendant of her freedom in any

16

significant way or placed her in a situation in which she could reasonably believe that her freedom of action or movement was restricted by such interrogation.

First, Defendant initiated contact with authorities about the Victim's murder and specifically told Corporal McAndrew that she would prefer to speak to someone in person. Thus, the basis for the interviews was initiated at Defendant's request. While the interviews were several hours in length, the detectives took multiple breaks and reminded Defendant that she had no obligation to speak to them and could terminate the interviews at any time. In fact, Defendant did ask to temporarily stop the August 17 interview so she could get her son, Jesse, home and the detectives readily complied. The first interview was conducted at the Morongo Station in an interview room with the door unlocked and the remaining interviews occurred at Defendant's residence. While the detectives transported Defendant the short distance between Morongo Station and her residence, this was done at Defendant's request because she did not have a license. Further, the detectives arrived in an unmarked police vehicle and parked in the garage as Defendant requested. No restraints were used at any point during the interviews. Our review of the record shows no instances where the detectives showed, threatened, or used force. In fact, the detectives used a calm demeanor throughout the interviews. The detectives also used investigative methods that included asking mostly open-ended questions and accommodating Defendant's various requests.

While it is true that the police investigation was focused on both Defendant and James Britton, that is only one factor of many in determining whether a person is in "custody" for *Miranda* purposes. *See Peters*, 642 A.2d at 1130. Further, Defendant had only implicated James Britton in the Victim's murder when she initially contacted Detective Coddington in the Monroe County District Attorney's Office. Thus, when Detectives Cahow and Phillips began

17

Defendant's interview, their investigation was more closely centered on James Britton and not Defendant. Lastly, it is very important to note that Detectives Cahow and Phillips repeatedly gave Defendant the "Beheler Admonishment" and Defendant acknowledged that she understood and wished to continue the interviews. Thus, Defendant's issue is without merit.

For the reasons stated above, Defendant's Motion to Suppress Statements is DENIED.

### 2. *Motion to Establish Dates for Disclosure of Grand Jury Testimony of Commonwealth Witnesses*

Defendant seeks the transcripts of her own testimony from the Monroe County Investigating Grand Jury. Def.'s Mot., p. 4. In addition, Defendant avers that, because she was not charged as a result of a previous Monroe County Investigating Grand Jury proceeding, it is presumed that such testimony is exculpatory and she is entitled to those transcripts prior to trial. *Id.* At the hearing on Defendant's motion, the Commonwealth agreed to immediately produce Defendant's own grand jury testimony. N.T. 7/12/16, pp. 4-5. Additionally, the parties agreed that the Commonwealth shall notify defense counsel which witnesses from the grand jury proceedings, if any, will be testifying at trial and produce their grand jury testimony prior to trial. N.T. 7/12/16, pp. 5-6. Accordingly, this issue is moot.

### 3. *Motion to Suppress Search of South Carolina Storage Facility*

Defendant avers that the items seized from a 2015 search of a South Carolina storage unit must be suppressed because she believes the search warrant contained a misstatement, namely "a murder occurred in *Monroe County*." Def.'s Mot., p. 5 (emphasis added). Because the search warrant misstated the location of the murder, Defendant argues there was insufficient probable cause to suspect the crime of Criminal Homicide or any other offense that would permit a search of the storage unit. *Id.*

18

First, We must determine whether to apply Pennsylvania or South Carolina law to the instant motion. "It is a fundamental principal of the conflicts of laws that a court employs its own state's procedural rules. . . . The law of evidence, including the admissibility of specifically offered evidence, has traditionally been characterized as procedural law." *Com. v. Dennis*, 618 A.2d 972, 980 (Pa. Super. 1992). In *Dennis*, the defendant, a New Jersey resident, was convicted in Pennsylvania of various drug offenses. *Id.* at 973. On appeal, he contested whether the application for the search warrant of his New Jersey property, as well as the accompanying affidavit, established probable cause. *Id.* at 974. The Pennsylvania Superior Court held that the defendant's issue involved a procedural rule and, consequently, made its determination under Pennsylvania law. *Id.* at 980.

In the present case, Defendant challenges whether the search warrant for the South Carolina storage facility had sufficient probable cause. Like *Dennis*, Defendant's challenge involves a procedural rule, which is governed by the law of the forum state. *See Dennis*, 618 A.2d at 980. Therefore, We shall apply Pennsylvania law to determine Defendant's instant suppression motion.

Search warrants are not to be issued except upon the establishment of probable cause. U.S. CONST. amend. IV ("[N]o Warrants shall issue, but upon probable cause."); PA. CONST. art. 1, § 8 ("[N]o warrant to search any place . . . shall issue . . . without probable cause."). It is Our duty, as a reviewing court of the issuing authority's determination of probable cause, "to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In doing so, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner." *Com. v. Jones*, 988 A.2d 649, 655 (Pa. 2010) (quoting *Com. v.*

19

*Torres*, 764 A.2d 532, 537–38 (Pa. 2001)). In other words, the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed. *Com. v. Gray*, 503 A.2d 921, 925 (1985) (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)).

In Pennsylvania, the question of whether probable cause exists for the issuance of a search warrant must be answered according to the "totality of the circumstances" test articulated in *Com. v. Gray*, 503 A.2d 921 (1985), which incorporates the reasoning of the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213 (1983). *Com. v. Huntington*, 924 A.2d 1252, 1255 (Pa. Super. 2007). "Under [the 'totality of the circumstances'] standard, the task of the issuing authority is to make a practical, common sense assessment whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Com. v. Murphy*, 916 A.2d 679, 682 (Pa. Super. 2007) (citing *Com. v. Melilli*, 555 A.2d 1254, 1262 (Pa. 1989).

When a search warrant is based on an affidavit containing deliberate or knowing misstatements of material fact, the search warrant is invalid. *Com. v. Clark*, 602 A.2d 1323, 1325 (Pa. Super. 1992) (internal citations omitted). Misstatements of fact will invalidate a search warrant and require suppression only if the misstatements of fact are deliberate and material. *Com. v. Tucker*, 384 A.2d 938, 941 (Pa. Super. 1978) (internal citations omitted). "A material fact is one without which probable cause to search would not exist." *Id.* (internal citations omitted). "A search warrant's inclusion of false evidence will not invalidate a search warrant if the warrant is based upon other information which is valid and sufficient to constitute probable cause." *Id.* (internal citations omitted).

In *Com. v. Minoske*, the appellant averred that the police officer made a misstatement of material fact in obtaining a search warrant and, therefore, all evidence obtained from the search of his apartment should have been suppressed. 441 A.2d 414, 418 (Pa. Super 1982). The officer's affidavit stated that the police informant had previously provided reliable information to the police in other cases, which resulted in three (3) arrests for narcotics violations. *Id.* At the suppression hearing, the officer testified that the informant had actually provided initial information in two (2) previous cases and arrests were not made until after an undercover officer bought narcotics from the two (2) individuals. *Id.* The Superior Court held that, while the affidavit may have contained a misstatement of fact, it did not contain a misstatement of material fact and, therefore, the search warrant was valid. *Id.* at 419. In reaching its conclusion, the court explained that, while the underlying circumstances of the case were, in part, based on the fact that the informant had provided reliable information in the past and that information resulted in three (3) arrests, that fact, by itself, was not essential for a determination of whether or not probable cause existed. *Id.* at 418.

Instantly, We find that the misstatement of the location of the murder, i.e. Monroe County, was not a deliberate misstatement. In his letter to Captain Ryan Neil of the South Carolina Law Enforcement Division ("SLED"), Corporal McAndrew wrote, "The Pennsylvania State Police are currently involved in an ongoing investigation into the murder of Robert Roudebush, 46, whose remains were discovered in Jackson Township, Monroe County in 2002." Com.'s Ex. 13. Corporal McAndrew also gave an overview of the investigation, the reason why he was seeking SLED's assistance, and asked that they obtain a search warrant to search the Brittons' storage unit located in South Carolina. N.T. 7/12/16, p. 143; Com.'s Ex. 13. Nowhere in the letter did Corporal McAndrew aver that the murder occurred in Monroe County. Based on

21

the information contained in Corporal McAndrew's letter, SLED mistakenly assumed that the murder itself also occurred in Monroe County and placed that misstatement of fact in its application for a search warrant. N.T. 7/12/16, p. 151; Com's Ex. 14. As Corporal McAndrew's letter did not contain a misstatement of fact and SLED simply misconstrued the location of the murder, said misstatement was not made deliberately.

Additionally, We find that the misstatement of the location of the murder was not a material fact. The magistrate had sufficient information and probable cause to sign the search warrant for the South Carolina storage unit. The magistrate was well aware from the search warrant that the search was in connection with a murder. The fact that the murder occurred in either Monroe or Luzerne County would have no bearing on whether probable cause existed. Defendant avers that the statement, "a murder occurred in Monroe County" must be omitted from the search warrant and, without that statement, the remainder of the search warrant application does not satisfy probable cause. Def.'s Br., p. 11. We disagree. Instead, by omitting the misstatement of fact, the search warrant application would read, "a murder occurred." That fact, along with the rest of the averments contained in the search warrant application, establishes probable cause. Therefore, Defendant's Motion to Suppress Search of South Carolina Storage Facility is DENIED.

## 4. Motion to Dismiss for Violation of Statute of Limitations

Defendant concedes that the statute of limitations has not run on the charges of Criminal Homicide and Conspiracy to Commit Criminal Homicide. *See* Def.'s Mot., p. 4. We will now discuss each of Defendant's remaining charges.

### A. Hindering Apprehension

Defendant argues that Hindering Apprehension carries a five (5) year statute of limitation and, consequently, it is time barred and must be dismissed. Def.'s Br. p. 13. The Commonwealth responds that Hindering Apprehension is not time barred pursuant to 42 Pa.C.S.A § 5551(4) because it is a felony offense and was committed in connection with a murder. Com.'s Br., pp. 22-23.

In Pennsylvania, the statute of limitations is not a constitutional right but, instead, is an act of legislative grace, whereby the government surrenders its ability to prosecute an individual after the passage of a stated period of time. *See Com. v. Johnson*, 553 A.2d 897, 900 (Pa. 1989). However, the Pennsylvania General Assembly chose to place no limitation of time on murder prosecutions due to its policy decision that punishment of the most serious crime should outweigh the difficulties otherwise incurred in the prosecution of "stale" charges. *See Com. Scher*, 803 A.2d 1204, 1229 (Pa. 2002) (plurality).

The "murder exception" to the statute of limitations is codified at 42 Pa.C.S.A. § 5551, which states the following:

> A prosecution for the following offenses may be commenced at any time:
> (1) Murder;
> \*\*\*
> (3) Conspiracy to commit murder or solicitation to commit murder if a murder results from the conspiracy or solicitation;
> (4) *Any felony alleged to have been perpetrated in connection with a murder of the first or second degree*, as set forth in 18 Pa.C.S. § 2502(a) or (b) and (d) (relating to murder);
> \*\*\*

42 Pa.C.S.A. § 5551 (emphasis added). As previously stated, Defendant concedes that the statute of limitations has not run on the Homicide and Conspiracy to Commit Criminal Homicide charges. Under 42 Pa.C.S.A. § 5551(4), any felony in connection with murder in the first or second degree also meets the exception. Defendant was also charged with Hindering

23

Apprehension, a felony of the third degree, in connection with the Victim's murder. Because Defendant was charged with an open count of Homicide, which includes First Degree Murder, Hindering Apprehension meets the criteria under 42 Pa.C.S.A. § 5551(4) and the five (5) year limitation does not apply. Therefore, Hindering Apprehension is not time barred.

### B. Perjury and False Swearing

Defendant argues that Perjury and False Swearing, which are alleged to have occurred in November 2008, are time barred because the Commonwealth was required to file those charges by November 2013. Def.'s Br. p. 13. Defendant concedes, however, that the statute of limitations for Perjury and False Swearing may have been extended because the fraudulent statements were discovered when Defendant contacted authorities in August 2015. *Id.* The Commonwealth responds that these charges did not come to fruition until August 2015, which is when Defendant first came forward with the true facts and circumstances surrounding the Victim's murder. Com.'s Br., p. 22. Therefore, The Commonwealth avers that the Perjury charge meets an exception, under 42 Pa.C.S.A. 5552(c)(1), to the five (5) year statute of limitation requirement. The Commonwealth failed to further address the False Swearing charge in its brief. *See* Com.'s Br., pp. 21-23.

If the statute of limitations has expired, the prosecution may nevertheless be commenced for:

> Any offense a material element of which is either fraud or a breach of fiduciary obligation within one year after discovery of the offense by an aggrieved party or by a person who has a legal duty to represent an aggrieved party and who is himself not a party to the offense, but in no case shall this paragraph extend the period of limitation otherwise applicable by more than three years.

42 Pa.C.S.A. § 5552(c)(1). "It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what

24

is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991) (citations omitted). When a person commits a crime where a material element is fraud, the Commonwealth must commence prosecution within one (1) year after the crime's discovery. *See* 42 Pa.C.S.A. § 5552(c)(1). However, a prosecution involving a crime that carries a two (2) year limitation must commence within five (5) years from the date of the offense. *See id.* Similarly, a prosecution involving a crime that carries a five (5) year limitation must commence within eight (8) years from the date of the offense. *See id.*

A person commits perjury if "in any official proceeding[,] he makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he does not believe it to be true." 18 Pa.C.S.A. § 4902(a). A prosecution for perjury must ordinarily commence within five (5) years after it is committed. 42 Pa.C.S.A. § 5552(b)(1). Because a material element of perjury is fraud, however, the Commonwealth may commence prosecution within one (1) year after discovering the offense, so long as eight (8) years have not transpired since the original offense date.

Instantly, the Commonwealth alleges that Defendant committed perjury when she testified falsely before the Monroe County Investigating Grand Jury on November 21, 2008. The Commonwealth learned that Defendant's grand jury testimony was false after she contacted Detective Coddington on August 14, 2015 and, shortly thereafter, gave statements to law enforcement in California and Pennsylvania. The Commonwealth filed a Criminal Complaint against Defendant on August 27, 2015, well within one (1) year after discovering that Defendant committed perjury. Furthermore, less than eight (8) years transpired between November 21,

25

2008, the offense date, and August 27, 2015, the date that the Commonwealth commenced prosecution. Therefore, Perjury is not time barred.

A person commits false swearing if he "makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, when he does not believe the statement to be true . . . if . . . the falsification occurs in an official proceeding[.]" 18 Pa.C.S.A. § 4903(a)(1). A prosecution for perjury must ordinarily commence within two (2) years after it is committed. 42 Pa.C.S.A. § 5552(a). Because a material element of false swearing is fraud, however, the Commonwealth may commence prosecution within one (1) year after discovering the offense, so long as eight (5) years have not transpired since the original offense date.

Like her perjury charge, Defendant is also alleged to have also committed false swearing when she testified before the Monroe County Investigating Grand Jury on November 21, 2008. The Commonwealth discovered this offense in August 2015 when Defendant made statements to police. The Commonwealth filed the Criminal Complaint well within one (1) year after discovering that the Defendant committed false swearing. The Commonwealth, however, was required to commence prosecution within five (5) years of the offense date. *See* 42 Pa.C.S.A. § 5552(c)(1). The Commonwealth commenced prosecution approximately six (6) years and nine (9) months after the offense date. Therefore, False Swearing is time barred.

### C. Tamper With/Fabricate Physical Evidence and Abuse of Corpse

Defendant avers that Tamper With/Fabricate Physical Evidence and Abuse of Corpse, which are alleged to have occurred in July 2002, are time barred because the Commonwealth was required to file those charges by July 2004. Def.'s Br. p. 13. The Commonwealth states that these crimes were committed pursuant to Defendant and James Britton's agreement to protect

26

themselves from exposure as the perpetrators of the Victim's murder. Com.'s Br., p. 23. The Commonwealth, however, concedes that, while these crimes were committed as part of a conspiracy, the Brittons did not renew their conspiracy by overt action during the applicable statute of limitations and, consequently, Tamper With/Fabricate Physical Evidence and Abuse of Corpse are time barred. *Id.*

Both Tamper With/Fabricate Physical Evidence and Abuse of Corpse carry a two (2) year statute of limitations. *See* 42 Pa.C.S.A. § 5552(a). Because the Commonwealth claims that these crimes occurred on July 7, 2002, the statute of limitations expired on July 7, 2004 unless an exception applies. One exception is 42 Pa.C.S.A. § 5554, which states that the period of limitation does not run when "the accused is continuously absent from this Commonwealth or has no reasonably ascertainable place of abode or work within this Commonwealth[.]" 42 Pa.C.S.A. § 5554(1).

When the Commonwealth asserts that a statute of limitations is tolled by an exception, such as the defendant's absence from Pennsylvania, the Commonwealth should allege the exception in the Criminal Information to apprise the defendant that he must defend not only against the crime but against the limitation of prosecution. *Com. v. Stockard*, 413 A.2d 1088 (Pa. 1980). However, if this notice of the exception is not in the information, the Commonwealth is not necessarily precluded from asserting it. *Id.* As long as defendant is notified within some reasonable time that the Commonwealth will seek to toll the statute of limitations, the due process requirements of notice are satisfied. *Id.*

Instantly, Defendant moved to California prior to July 7, 2004, which is when the statute of limitations would have expired. The Commonwealth, however, did not allege the exception in the Criminal Information or elsewhere. Therefore, the Commonwealth failed to give notice that

27

it seeks to toll the statute of limitations. Consequently, Tamper With/Fabricate Physical Evidence and Abuse of Corpse are time barred.

Accordingly, Defendant's Motion to Dismiss for Violation of Statute of Limitations is GRANTED in part and DENIED in part.

### 5. *Motion for Improper Venue*

With regard to Criminal Homicide, Defendant avers that Monroe County lacks venue over that specific charge because that crime occurred in Luzerne County. Def.'s Br., p. 12. Consequently, Defendant requests that We transfer Defendant's homicide case to Luzerne County. *Id.* The Commonwealth responds that Monroe County is a proper venue because the Victim's body was found within Monroe County. Com.'s Br., p. 19.

As a preliminary matter it is important to distinguish venue from jurisdiction. In order for a court to hear a criminal case, it must have both proper jurisdiction and venue. *See Com. v. Gross*, 101 A.3d 28, 32 (Pa. 2014). Jurisdiction relates to the court's power to hear and decide the controversy presented. *Com. v. Bethea*, 828 A.2d 1066, 1074 (Pa. 2003). "[J]urisdiction relates to the competency of a court to hear and decide the type of controversy presented." *Id.* In Pennsylvania, all common pleas courts have statewide jurisdiction in case arising under the Crimes Code. *Id.* Thus, there is no question we have jurisdiction to hear this case. *See* 42 Pa.C.S. § 931(a).

Although all common pleas courts have jurisdiction to resolve a criminal case, such should only be exercised in the county in which venue lies. *Gross*, 101 A.3d at 33. Venue refers to the convenience and locality of trial, or "the right of a party to have the controversy brought and heard in a particular judicial district." *Bethea*, 828 A.2d at 1074. "Venue in a criminal action properly belongs in the place where the crime occurred." *Id.* at 1075 (citations omitted). Rules

28

of venue recognize the propriety of imposing geographic limitations because "the place where the crime itself occurred . . . is where the evidence and the witnesses will most likely be located." *Id.*

Venue challenges concerning the locality of a crime stem from the Sixth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution, both of which require that a criminal defendant stand trial in the county in which the crime was committed, protecting the accused from unfair prosecutorial forum shopping. Thus, proof of venue, or the locus of the crime, is inherently required in all criminal cases.

Recently the burden of proof in relation to venue challenges was definitively established by a case originating from this judicial district. *See Gross*, 101 A.3d. Because the Commonwealth selects the county of trial, the Pennsylvania Supreme Court held the prosecution shall bear the burden of proving venue is proper. *Id.* at 33. That is evidence an offense occurred in the judicial district with which the defendant may be criminally associated, either directly, jointly, vicariously. *Id.* "Venue merely concerns the judicial district in which the prosecution is to be conducted; it is not an essential element of the crime, nor does it relate to guilt or innocence. Because venue is not part of a crime, it need not be proven beyond a reasonable doubt as essential elements must be." *Id.* Accordingly, applying the "preponderance of the evidence" standard to venue challenges allows trial courts to speedily resolve this threshold issue without infringing on a defendant's constitutional rights. *Id.* Furthermore, like essential elements of a crime, venue need not be proven by direct evidence but, instead, can be inferred by circumstantial evidence. *Id.* (citations omitted).

In *Gross*, the defendant ("Gross"), a New Jersey resident, attempted to acquire a New Jersey firearm permit but was informed that the process would take several months. 101 A.3d at

29

31. Instead, Gross obtained a Pennsylvania driver's license using her boyfriend's ("Autenrieth") address and, shortly thereafter, Gross and Autenrieth went to a Berks County store, where Gross used her new license to buy a handgun. *Id.* Later, at his residence, Autenrieth showed Gross how to use the gun, offered to clean it for her and put it above his washer and dryer. *Id.* Autenrieth was prohibited from possessing a firearm due to a protection from abuse order. *Id.* A week later, Autenrieth took the gun, went to his estranged wife's house, and kidnapped his nine (9) year old son at gunpoint. *Id.* Police were called, Autenrieth fled, and the chase ended with a shoot-out in Monroe County in which Autenrieth killed one Pennsylvania State Trooper and wounded another before being shot to death. *Id.* Gross was charged in Monroe County with criminal conspiracy, firearms not to be carried without a license, possession of firearm prohibited, and lending or giving of firearms prohibited. *Id.* at 31-32.

Defendant challenged venue and the trial court held Gross could not be prosecuted in Monroe County because the conspiracy between Gross and Autenrieth was reached and completed in Northampton County and Autenrieths's possession of the firearm in Monroe County did not constitute an overt act in furtherance of the criminal agreement. *Gross*, 101 A.3d at 32  The Pennsylvania Superior Court affirmed. *Id.* The Pennsylvania Supreme Court reversed, holding:

> Because Autenrieth was present with the gun in Monroe County, and Gross aided Autenrieth's illegal possession of that firearm, Gross could be found liable as an accomplice for Autenrieth's illegal possession wherever he was, including Monroe County. Accordingly, we conclude the Commonwealth proved by a preponderance of the evidence that Gross could be prosecuted under all criminal charges in Monroe County.

*Id.* at 35-36.

The Pennsylvania Rules of Criminal Procedure state that "when charges arising from the same criminal episode occur in more than one judicial district, the criminal proceeding on all the

30

charges may be brought before one issuing authority in a magisterial district within any of the judicial districts in which the charges arising from the same criminal episode occurred." Pa.R.Crim.P. 130(A)(3). The comment to Rule 130 goes on to explain that when charges arise from a single criminal episode that occurred in more than one judicial district, the magisterial district in which the proceeding on all charges is brought, *i.e.*, the one with venue, may be any one of the magisterial districts in which the charges occurred. Pa.R.Crim.P. 130, cmt. Therefore, so long as venue is proper in Monroe County on one of the charges arising from the same criminal episode, venue is proper for all the charges.[17]

Like *Gross*, Defendant is charged with conspiracy. The material elements of conspiracy are: "(1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator and (3) an overt act in furtherance of the conspiracy." *Com. v. Spotz*, 756 A.2d 1139, 1162 (Pa. 2000). An "overt act" means an act done in furtherance of the object of the conspiracy. *See* 18 Pa.C.S.A. § 903(e). Additionally, in connection with questions of venue, the Pennsylvania Supreme Court noted, "a prosecution for criminal conspiracy may be brought in any county where the unlawful combination was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of the unlawful combination." *Com. v. Fithian*, 961 A.2d 66, 78 (Pa. 2008).

---

[17] The comment to rule 130 goes on to say "the decision of in which judicial district . . . the proceedings are to be brought is to be made initially by the law enforcement officers or attorneys for the Commonwealth. In making the decision, the law enforcement officers or attorneys for the Commonwealth must consider in which judicial district[,] under paragraph (A)(3)[,] it would be in the interest of justice to have the case proceed, based upon the convenience of the defendant and the witnesses, and the prompt administration of justice." While this specific provision was not raised or addressed by either party We find the prompt administration of justice and convenience of the witnesses dictates the case be brought in the 43rd Judicial District. The investigation was opened when the dismembered and burnt remains were discovered in Monroe County. As such the Monroe County Coroner's office investigated and attempted to discover the victim's identity. Over the course of the next thirteen years, investigators working out of Monroe County, continued the investigation including presenting the case to a Monroe County investigating Grand Jury in 2009. Under these circumstances, many of the witnesses will be from Monroe County and the administration of justice dictates it be tried in the 43rd Judicial District.

31

A *prima facie* case has been made to show a criminal conspiracy between Defendant and James Britton, under which the couple would kill the Victim, dismember his body, and dispose of it in Monroe County. Because of this criminal agreement, the Victim's remains were brought from Luzerne County to Monroe County where they were placed into two 55 gallon drums and burned. The object of the conspiracy, as articulated by the charges, was to kill the Victim and dispose of his body, and such was not completed or terminated until the dismembered body was brought to Monroe County and discarded. *See* 18 Pa.C.S.A. § 903(g)(1) ("conspiracy is a continuing course of conduct which terminates when the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he conspired[.]"). The placing of the Victim's body in Monroe County was an integral part of the conspiracy. Therefore, venue is proper in the courts of this judicial district.

Although dealing with venue between two states, persuasive authority can be found in the Crimes Code at 18 Pa.C.S.A. § 102(c), which states:

> When the offense is homicide or homicide of an unborn child, either the death of the victim, including an unborn child, or the bodily impact causing death constitutes a "result" within the meaning of paragraph (a)(1) of this section, and if the body of a homicide victim, including an unborn child, is found within this Commonwealth, it is presumed that such result occurred within this Commonwealth.

18 Pa.18 Pa.C.S.A. § 102(c). This rule was prompted by unique problems which arise in ascertaining the situs of a homicide for jurisdictional purposes. Although, by its terms, the statute refers to the Commonwealth of Pennsylvania for purposes of applying territorially the law of homicide, the same considerations are applicable to determine in which county a homicide case is to be tried. *Com. v. Bradfield*, 508 A.2d 568, 571-72 (Pa. Super. 1986). In a homicide

case, 18 Pa.C.S.A. § 102[18] allows for trial to take place within the county in which a homicide victim is found. *Com. v. Field*, 827 A.2d 1231, 1235 (Pa. Super. 2003). While that determination of venue is not exclusive, it may not be altered unless the defendant requests a change of venue and the trial court's decision thereon. *Id.*

Instantly, the Victim's body was found in Monroe County. While Defendant does request a change of venue, We find that venue is proper for the reasons already discussed. Accordingly, Defendant's Motion for Improper Venue is DENIED.

### 6. Motion for Individual Voir Dire

In her Omnibus Pretrial Motion, Defendant requested that We conduct an individual, sequestered *voir dire* of each prospective juror in order to counter any effects of prejudicial pretrial publicity. Def.'s Mot., pp. 6-7. Defendant, however, failed to address this issue in her brief.

The Rules of Criminal Procedure require individual *voir dire* only for capital cases. Pa.R.Crim.P. 631(F). In a non-capital case, a trial judge may use individual *voir dire*, but he or she is not required to. *See id.* Instantly, Defendant is not charged with a capital crime and, therefore, the use of individual *voir dire* is not required. "The manner in which *voir dire* will be conducted is left to the discretion of the trial court." *Com. v. Moore*, 756 A.2d 64, 65 (Pa. Super. 2000). The trial court also has discretion in non-capital cases to determine who will ask questions of the jurors and whether the jurors will be questioned individually or collectively. *Com. v. Hathaway*, 500 A.2d 443 (Pa. Super. 1985).

---

[18] While 18 Pa.C.S.A.§ 102 refers to the Commonwealth of Pennsylvania for purposes of applying territorially the law of homicide, the same considerations are applicable to determine in which county a homicide case is to be tried. *Com. v. Bradfield*, 508 A.2d 568, 571 (Pa. Super. 1986).

Not every case where pretrial publicity exists mandates individual *voir dire*. *Hathaway*, 500 A.2d at 449 (holding that the record did not establish prejudicial pretrial publicity in a first degree murder case). However, where pretrial publicity is extensive, close in time to the trial, and clearly prejudicial, individual *voir dire* in a non-capital case may be warranted. *Com. v. Johnson*, 269 A.2d 752, 756–57 (Pa. 1970) (finding that clear prejudice existed in a burglary case where the defendant's criminal record had been detailed in the news and the district attorney had made inflammatory remarks to the media). Furthermore, the Pennsylvania Supreme Court commented that an accurate accounting of factual information from a case does not amount to prejudicial pretrial publicity. *Id.* at 756.

This Court has historically been able to impanel an impartial jury without the use of individual *voir dire*, even in the presence of extensive pre-trial publicity. Although jurors are questioned collectively, where more detailed answers are necessary, the prospective juror and counsel approach the bench in order to have a private, on-the-record discussion of the issue. This has been more than adequate to ensure that a fair and impartial jury is empaneled. Defendant has failed to argue what, if any, prejudicial pretrial publicity has occurred in her case. Individual *voir dire*, therefore, is not necessary. There are other methods available to ascertain the jurors' exposure to the media and their ability or lack thereof to set aside that information. Thus, Defendant's Motion for Individual Voir Dire is DENIED.

## 7. *Motion for Use of Jury Questionnaire*

Defendant requests that We order that *voir dire* be supplemented by a juror questionnaire, specifically tailored by defense counsel and reviewed by the district attorney, to be completed by each prospective juror. Def.'s Mot., p. 7. In support of her request, Defendant avers that the trial

34

will likely involve drug abuse, mental health, and rather gory descriptions and photographs that may not be suitable to all potential jurors. Def.'s Br., p. 14.

"A criminal defendant's right to an impartial jury is explicitly granted by Article 1, Section 9 of the Pennsylvania Constitution and the Sixth Amendment of the United States Constitution." *Com. v. Ellison*, 902 A.2d 419, 423 (Pa. 2006). Juror questionnaires are to be used in conjunction with *voir dire* to "secure a competent, fair, impartial and unprejudiced jury." *Id.* The questionnaire should "serve[] to facilitate and expedite *voir dire*." *Id.* at 424.

Pennsylvania Rule of Criminal Procedure 632 states that potential jurors must be given the standard "questionnaire required by . . . this rule." Pa.R.Crim.P. 632(A)(1). The Rule also allows for "any supplemental questionnaire provided by the court." *Id.* The comment to Rule 632 makes clear that the need for a supplemental questionnaire is discretionary and its necessity is decided on a case-by-case basis.

Supplemental questionnaires are typically used in this district only in capital cases. In the instant case, We find no reason why a case-specific questionnaire would further expedite *voir dire*. The standard juror questionnaires are used in conjunction with *voir dire* to impanel an impartial jury. Defendant is concerned that potential jurors may be prejudiced because the trial will involve various issues such as drug abuse, mental health issues, and potentially gory descriptions and photographs of the Victim's body. The concerns, however, can be properly addresses through careful questioning at *voir dire*. Thus, Defendant's Motion for Use of a Juror Questionnaire is DENIED.

Having decided all matters before Us, We enter the following Order:

35

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : **NO. 2192 CR 2015** |
| | : |
| vs. | : |
| | : |
| | : |
| **STACY BRITTON,** | : |
| **Defendant** | : **Omnibus Pretrial Motion** |

## ORDER

**AND NOW**, this 26th day of October, 2016, upon review of Defendant Stacy Britton's

Omnibus Pretrial Motion, and in consideration of the record, the evidence presented at the

hearing on said motion, and the counsels' subsequent briefings, We **ORDER** the following:

(1) Defendant's Motion to Suppress Statements is **DENIED**.

(2) Defendant's Motion to Suppress Search of South Carolina Storage Facility is

**DENIED**.

(3) Defendant's Motion to Dismiss for Violation of Statute of Limitations is **GRANTED**

in part and **DENIED** in part. Thus, the following charges are dismissed: (1) False Swearing –

Official Proceeding; (2) Tamper With/Fabricate Physical Evidence and; (3) Abuse of Corpse.

(4) Defendant's Motion for Improper Venue is **DENIED**.

(5) Defendant's Motion for Individual Voir Dire is **DENIED**.

(6) Defendant's Motion for Use of a Jury Questionnaire is **DENIED**.

Trial in this matter is scheduled for the November 2016 term. Jury selection shall

commence on November 1, 2016 at 8:30 a.m., and Trial shall commence on November 2, 2016

at 9:00 a.m. in Courtroom 1, Monroe County Courthouse, Stroudsburg, Pennsylvania.

36

Counsel for the respective parties: Assistant District Attorney Michael Mancuso for the Commonwealth; and Brandon Reish, Esq. for Defendant Stacy Britton are ATTACHED and are not released until this matter has been brought to conclusion.

BY THE COURT:

MARGHERITA PATTI-WORTHINGTON, P.J.

cc:      Michael Mancuso, Esq., ADA
Brandon Reish, Esq., Defense Counsel
Court Administration
MPW2016-0046

37

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | NO. 2192 CR 2015 |
| | : | |
| v. | : | |
| | : | |
| STACY BRITTON | : | |
| | : | POST-SENTENCE MOTION |
| Defendant | : | |

## OPINION

This matter comes before the Court on Stacy Britton's ("Defendant") Post-Sentence Motion for a new trial. The facts and procedural history are as follows:

Defendant was found guilty of Murder in the First Degree, Criminal Conspiracy to Commit Homicide, Perjury, and Hindering Apprehension after a jury trial on November 7, 2016. We sentenced Defendant on January 6, 2017 to life imprisonment without the possibility of parole for the Murder in the first Degree conviction, running concurrent with a sentence of not less than 10 years nor more than 20 years for the conviction of Criminal Conspiracy to Commit Homicide. We also sentenced Defendant to a consecutive sentence of not less than 9 months nor more than 24 months for Perjury and a consecutive of not less than 9 months nor more than 24 months for Hindering Apprehension.

Defendant filed a post-sentence motion on January 17, 2017. In the motion, Defendant claims her convictions were against the weight of the evidence, and Defendant therefore requests that this Court vacate the sentence and grant a new trial. The motion does not specify which convictions Defendant challenges. The Section of Defendant's motion, titled "Motion for a New Trial—Weight of Evidence," in its entirety, states:

1

1. Defendant was convicted after Trial by Jury.
2. Defendant believes that the verdict was against the weight of the evidence and would shock the conscience for reasons made clear by review of the record including:

    a. The weight of the evidence was against any active assistance with the murder;
    b. Defendant informed police that she did not believe Mr. Britton would commit the murder;
    c. Evidence weighed heavily in favor of Defendant's claim that she did not believe Mr. Britton would murder anyone;
    d. The statement given by Defendant at the home of Mr. Britton in California in which she admitted to participating in the murder of Mr. Roudenbush was made under circumstances that question her voluntariness and of the validity of the statement."

[Def.'s post-sentence motion ¶1, 2a-d]

We interpret Defendant's motion as referencing the convictions of Murder in the First Degree and Criminal Conspiracy to Commit Criminal Homicide. Defendant also questions the voluntariness of her statements at the California residence under the same weight of the evidence argument, suggesting the jury's verdict "shocks" the conscience by finding these statements voluntary by a preponderance of the evidence.

"Given the primary role of the jury in determining questions of credibility and evidentiary weight, this settled but extraordinary power vested in trial judges to upset a jury verdict on grounds of evidentiary weight is very narrowly circumscribed." Criswell v. King, 575 Pa. 34, 46, 834 A.2d 505, 512 (2003) "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. *Commonwealth v. Whiteman*, 336 Pa.Super. 120, 485 A.2d 459 (1984). Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Tibbs*, 457 U.S. at 38 n. 11, 102 S.Ct. 2211.3 An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different

2

conclusion. *Thompson, supra.* A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id.,* Com. v. Widmer, 560 Pa. 308, 319–20, 744 A.2d 745, 751–52 (2000)

In other words, "a new trial is warranted on weight of the evidence grounds only in truly extraordinary circumstances, *i.e.,* when the jury's verdict is *'so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'"* Criswell v. King, 575 Pa. 34, 46, 834 A.2d 505, 512 (2003) (internal citations omitted).

In her weight of the evidence motion, Defendant claims her statement "at the home of Mr. Britton in California in which she admitted to participating in the murder of Mr. Roudenbush was made under circumstances that question her voluntariness and of the validity of the statement." [Def.'s Post-Sentence Motion ¶ 2d] Defendant suggests that the jury's finding of her statements as voluntary by a preponderance of the evidence is so contrary to the weight of the evidence that it shocks the conscience.

"When a defendant alleges that his waiver or confession was involuntary, the question 'is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.'" Commonwealth v. Templin, 568 Pa. 306,

3

795 A.2d 959, 966 (2002) (quoting Commonwealth v. Nester, 551 Pa. 157, 709 A.2d 879, 882 (1998)).

We have already determined on pretrial motion that Defendant's statements were not impermissibly coerced, were made freely and knowingly, were noncustodial in nature, and though surreptitiously recorded, were admissible at trial. [1] We denied Defendant's motion to suppress the statements, and Defendant at trial asserted her right to reargue the issue of voluntariness of her statements. As our Superior Court has noted, "despite a pretrial ruling that a confession is voluntary...a criminal defendant nonetheless is entitled to a second opportunity to test the voluntariness of his statement by introducing evidence at trial relating to voluntariness and have the jury consider the question." Com. v. Cameron, 2000 PA Super 207, ¶ 12, 780 A.2d 688, 693 (2001) (internal citations and quotations omitted)

At trial, the jury considers the "totality of the circumstances" in determining whether Defendant's "will has been overborne and his capacity for self-determination critically impaired." Commonwealth v. Perez, 577 Pa. 360, 845 A.2d 779, 787 (2004); Com. v. Nester, 551 Pa. 157, 163, 709 A.2d 879, 882 (1998) In examining the 'totality of the circumstances' surrounding the Defendant's statements at the residence, we look to: "the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion. Id at 163-64, 709 A.2d 879, 882 (1998) (internal Citations and quotations omitted)

Our Supreme Court also explained that "encouraging a suspect to cooperate with the investigation and answer questions honestly is a permissible interrogation tactic....An

---

[1] The Court, addressing Defendant's pre-trial omnibus motion, determined Pennsylvania law governs the issue of whether Defendant was in "custody" in deciding whether the lack of Miranda warnings was improper. In the same opinion, the court determined California law applies to surreptitious recordings of the Defendant. Omnibus Pretrial Motion Opinion and Order, Dated October 25, 2016. Neither of these issues has been raised in the Defendant's Post-Sentence Motion.

4

individual's mental condition is relevant to his susceptibility to coercion, but it is only one factor in analyzing voluntariness under the totality of the circumstances." Id. at 167 (Internal citations and quotations omitted).

At trial, we instructed the jury on voluntariness with respect to Defendant's statements:

> You may not consider the statement as evidence against the Defendant unless you find that she made the statement voluntarily. This means that you must be satisfied by a preponderance of the evidence. Now, this is a different standard. It is not beyond a reasonable doubt. But the Commonwealth would have to have proven to you by a preponderance of the evidence, more likely than not, more probably than not, that the Defendant made the statement voluntarily.

> So what does the term voluntary mean in this context? A Defendant's statement is always regarded as voluntary if it is made spontaneously. That means it is not made in response to police questioning. This is true even if a Defendant is intoxicated, mentally ill, or influenced by some other internal compulsion to speak. However, if a Defendant makes a statement in response to police questioning, this is the basic test to determine voluntariness.

> To be voluntary a defendant's statement must be the product of a rational mind and a free will. The Defendant must have a mind capable of reasoning about whether to make a statement or say nothing, and she must be allowed to use it. The Defendant must have sufficient willpower to decide for herself whether to make a statement and she must be allowed to make that decision. This does not mean that a statement is involuntary because the Defendant made a hasty or a poor choice. It might not have been wiser to say nothing, nor does it mean that a statement is involuntary merely because it was made in response to certain questions. It does mean however, that if the Defendant's mind and will are confused or burdened by promises or advantage, threats, physical or psychological abuse, or other improper influences, any statement she makes is involuntary.

> The reason the law prohibits involuntary statements are grounded in both the United States and the Pennsylvania Constitutions. The prohibition is based on a strong public policy that disapproves of the use by police of improper methods to extract involuntary confessions or admissions. Furthermore, our system for enforcing the law should not operate in a way that takes advantage of persons who are in a physically or mentally weakened condition to the point that they cannot give a knowing, intelligent, and voluntary statement.

> Where voluntariness is an issue, the commonwealth has the burden of proving, again, by a preponderance of the evidence, that it is more likely than not that the statement was voluntary. You should consider the totality of the circumstances and all of the relevant evidence, excluding the statement as to whether the Defendant's statement was voluntary. So that's the totality of the circumstances surrounding how each of those statements came

5

to fruition. In deciding whether the statement was voluntary, you should weigh all of the facts and circumstances surrounding the making of the statement that shed light on whether the statement was the product of a rational mind and free will and not of a mind or will confused or burdened by improper influences.

The facts and circumstances to be considered include the age, intelligence, personality, education, experience and mental and physical state of the defendant, how the Defendant was treated before, during, and after the questioning, the time, place and conditions under which the Defendant was detained and questioned, the motives and attitudes of the police who questioned her, and what was said and done by the police, the Defendant, and anyone else present during the questioning.

In deciding whether the statement was voluntary, you must put aside any opinion you may have regarding the truthfulness of the statement. You should not let yourself be influenced by an opinion that the statement is true or that it is false. The first task has to be whether the statement was made and whether it was voluntary.

If you find that the Defendant made the statement voluntarily, then you may consider the statement as evidence against her. You should consider the facts and circumstances surrounding the making of the statement along with all other evidence in the case in judging the truthfulness and deciding how much weight, if any, the statement deserves on the question of whether the Defendant has been proven guilty.

[11.7.16 Trial Transcript at 79:15-25; 80-82]

These jury instructions are comprehensive and consistent with Pennsylvania law on the matter of voluntariness of statements.

Detective Jonathan Cahow, who interviewed Defendant at the residence, affirmed in testimony at trial: Defendant in August 2015 contacted law enforcement to discuss the homicide of Robert Roudenbush ("the victim"). She agreed to talk with police about the murder, first at the police station, and then at the above mentioned California home ("the residence"). Defendant was residing at the residence at the time she made the statements in question. [11.3.16 Trial Transcript at 115:4-8] Defendant spoke with police from 4 until after 8 pm at the station; Defendant then asked to continue the interview at her house, which lasted a few hours, until 10:45 pm when Defendant said she was tired; she agreed to talk with police the next day. Police returned to the residence the next day and interviewed Defendant for several more hours. [Id. at

6

95:17-23.] Defendant used the restroom, made food, and discussed irrelevant topics. [Id. at 28:4-7; 92:23-25; 93:1] Police said Defendant was doing the right thing, and encouraged her to make a pretext call to the codefendant; police indicated she should tell the truth if she made the made a pretext call. [Id. at 11:5-15; 95:3-6] At this time, Defendant changed her story to admit being present at the same house as the victim when he died. [Id. at 20:11-18] The police were across the table from the Defendant, who was upset, and there was little change in proximity between the Defendant and police during the interview. [Id. at 95:17-23]

Based on the record at trial, it would not have been unreasonable of the jury to have found and inferred the following as facts: while the duration of the interviews were several hours in length, officers stopped interviewing Defendant when she communicated she was tired, and they agreed to talk the next day at her residence; this suggests Defendant was comfortable asserting to the officers if and when she was fatigued, and that she knew the officers would oblige her request to suspend the interview, based on her stated mental or physical state; during the interview the following day, Defendant changed her story to being present during the murder; she was upset during the interview; she changed her story after officers proposed she make a pretext call to Co-defendant, and police encouraged her to be truthful.

As mentioned, "encouraging a suspect to cooperate with the investigation and answer questions honestly is a permissible interrogation tactic....An individual's mental condition is relevant to his susceptibility to coercion, but it is only one factor in analyzing voluntariness under the totality of the circumstances." Nester at 167 (Internal citations and quotations omitted).

It would not have been unreasonable of the jury to find that the police were accommodating, not threatening or impermissibly coercive, and that although Defendant was upset during the interview, Defendant's will was not "overborne and [her] capacity for self-

7

determination critically impaired." The jury's finding by a preponderance of the evidence that Defendant's statements were voluntary, based on a totality of the circumstances surrounding said statements, does not shock the conscience. Here, justice does not warrant upsetting the jury's verdict. Therefore, Defendant's weight of the evidence claim, as it relates to questioning the voluntariness of Defendant's statements, is denied.

Defendant's remaining Post-Sentence Motion concerning the weight of the evidence relates to the First Degree Murder and Criminal Conspiracy to Commit Homicide convictions. We will first consider the First Degree Murder conviction.

Defendant claims the weight of the evidence was against any active assistance with the murder. [Def.'s Post-Sentence Motion ¶ 2a.]

A criminal homicide is murder in the first degree when it is committed by an intentional killing .18.Pa. Cons. Stat. §2502. "Intentional killing" is a willful, deliberate, and premeditated killing. Therefore, a first degree murder conviction requires the commonwealth to prove beyond a reasonable doubt "a human being was unlawfully killed, the defendant was responsible for the killing, and that the defendant acted with malice and a specific intent to kill." 18 Pa. C.S. §2502 (a); Commonwealth v. Johnson, 615 Pa. 354, 42 A. 3d 1017, 1025 (2012). Commonwealth v. Burno, 154 A. 3d 764 (Pa. 2017).

"The finder of fact may infer malice and specific intent to kill based on the defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Arrington,* 624 Pa. 506, 86 A.3d 831, 840 (2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 479, 190 L.Ed.2d 363 (2014)." Com. v. Hitcho, 123 A.3d 731, 746 (Pa. 2015). A 'deadly weapon' includes "a device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S.A. § 2301

8

A hammer constitutes a deadly weapon when used against a head, as our Supreme Court has held:

> "using a hammer to repeatedly smash a human being's skull undoubtedly supports a finding that a deadly weapon was used on a vital part of the victim's body and permits an inference of a specific intent to kill. See Commonwealth v. Marshall, 534 Pa. 488, 500, 633 A.2d 1100, 1106 (1993) (use of hammer on head of victim was sufficient to demonstrate specific intent to kill).

Com. v. O'Donnell, 559 Pa. 320, 329, 740 A.2d 198, 203 (1999)

Defendant told police she and Codefendant had partnered with the victim in drug trade. [11.4.16 trial transcript at 97:13-15, 19] This, coupled with Defendant's statements admitted at trial includes, but is not limited to, the following: Victim was at the (Pennsylvania) residence of Defendant and Codefendant on July 4th; Defendant was holding a hammer when the victim was sitting in a chair, injecting drugs into his leg; Codefendant brought drugs on a plate; the victim looked at the plate and "that was when I was supposed to hit him"; "I had come alongside him"; the victim then "turned his head"; the victim "looked at the hammer, and he looked up at me" and said 'Oh no, a violent death.' Commonwealth 9 ¶ 1:09:30-40; 1:13:23-30; 1:15:00-1:15:15; 1:16:20-25; 1:18:40-1:19:00; 1:13:45-50; played during 11.3.16 trial, see Trial Transcript at 22:22)

During trial, Forensic Pathologist, Samuel Land, M.D. ("Dr. Land"), who reviewed the autopsy records of the victim and the case, testified regarding his assessment. [11.3.16 Trial Transcript at 37:8; 44:5-9] Dr. Land said the victim's "pre-mortem" injuries included "three depressed skull fractures," and provided medical reasons for concluding the victim was alive when these fractures occurred. [Id. at 73:3-9,11-15]

Dr. Land, viewing the mini sledge hammer admitted as Commonwealth 13, affirmed that the head wounds were consistent with the hammer, supposing it delivered a glancing blow, as opposed to a direct blow. [Id. at 76:12-15]

9

Defendant said Codefendant, during the murder, threw a knife at the victim, who then picked up the knife and cut Defendant's leg. [Id. 26:9-18] Defendant told police she was cut on the right leg during the homicide. [11.4.16 Trial Transcript at 61:24-25; 62:1-2]

Hospital records introduced at trial indicate Defendant, using a false name, received treatment at 7:30am on July 5, 2002, for a laceration to her right leg resulting from "playing with knife." [Commonwealth 24 p.5, 11.4. 16 Trial Transcript at 57:22-24; 58:4-7]

Based on the above facts introduced at trial, the jury's conviction finding the Defendant guilty of First Degree Murder does not shock the conscience. Therefore, Defendant's weight of the evidence claim, as it relates to the First Degree Murder conviction, is denied. Next, we consider the post-sentence motion with respect to the Criminal Conspiracy to Commit Homicide conviction.

Defendant Claims "evidence weighed heavily in favor of Defendant's claim that she did not believe Mr. Britton would murder anyone." [Def.'s Post Sentence Motion ¶ 2c]

To sustain a criminal conspiracy conviction, the Commonwealth must establish a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903.2 Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 1025, 1030 (1996) (citations omitted). The overt act need not accomplish the crime-it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. Com. v. Weimer, 602 Pa. 33, 38–39, 977 A.2d 1103, 1105–06 (2009).

Each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder-the specific intent to kill. Com. v. Wayne, 553 Pa. 614, 632, 720 A.2d 456, 464 (1998) In the case of a conspiracy to commit homicide, each member of the

10

conspiracy "can be convicted of first-degree murder regardless of who inflicted the fatal wound." Montalvo, supra at 932. <u>Com. v. Johnson</u>, 604 Pa. 176, 185, 985 A.2d 915, 920 (2009)

Defendant is correct in claiming she had "informed police that she did not believe Mr. Britton would commit the murder." [Def.'s Post-Sentence Motion ¶2b] Detective Cahow's testimony below may have provided the jury with broader context for this statement:

> Stacy said that Jim would often talk about killing people that he was angry with, and she thought a lot of it was just talk, but this progressed. This situation progressed past that. They started to talk about how they we're going to kill Bob. He would bring up different plans. One was to kill him in a restaurant, and Stacy was—you know, her idea was there's no such thing as a perfect crime. We're going to get caught. So Jim would bring up these plans, and she would poke holes in them. They finally came up with a plan to distract him in their apartment with a plate of food. The original plan was to put a plate of pork chops in front of Bob, and then while Bob was distracted by the food Stacy would hit him with a hammer, and then Jim would go from there.

[11.3.16 Trial Transcript at 13:9-24]

Detective Cahow testified Defendant told him she "rehearsed plans to kill" the victim, and "practiced the scenario a couple times in the apartment." [11.3 16 Trial Transcript at 13:25; 13:1-4; 15:5-10] Defendant said moments before the victim was attacked, "I had the hammer in my one hand, Jim had racked up some crack on a plate and was bringing it in." Defendant said Codefendant sprang at the victim. [Commonwealth 9 at 1:13:20-30, 1:15:00-1:15:15, introduced during 11.3.16 Trial, see transcript at 22:21-22.]

Detective Cahow in his testimony affirmed Defendant told him she physically helped prevent victim from escaping after the victim was stabbed; audio recording played to the jury included Defendant stating the victim tried to escape through the door, and Defendant "was going to try to help" Codefendant "pull him back in." [11.3.16 Trial Transcript at 26:16-25; 27:1-8; 27:14-23; 22:21-22 Commonwealth 9: at 1:12:35-50, 1:18:50-1:19:00] Shortly after, Defendant saw Codefendant on top of the victim, "stabbing him, saying, "why won't you die?" [Commonwealth 9 at 1:22:26-32] She said the victim had at least two or three stab wounds in his

11

chest, and Codefendant "had the green knife in his hand." [Id at 1:18:25-30,] Dr. Land at trial testified the victim's cause of death was "multiple sharp force and blunt force trauma." [11.3.16 Trial Transcript at 50:2-4]

Based on the facts introduced at trial, the jury's conviction finding the Defendant guilty of Criminal Conspiracy to Commit Homicide does not shock the conscience. Therefore, Defendant's weight of the evidence claim, as it relates to the Criminal Conspiracy to Commit Homicide conviction, is denied.

Defendant's post sentence motion, for the above reasons, is denied.

12

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,    :    NO. 2192 CR 2015

       : 

          v.           : 

       : 

STACY BRITTON        : 

       :    POST-SENTENCE MOTION

          Defendant.        : 

## ORDER

**AND NOW**, this 8th day of May, 2017, Defendant's Post-Sentence Motion to grant a new trial is **DENIED**.

Defendant is advised that she has thirty (30) days from the date of this order within which to file an Appeal with the Superior Court of Pennsylvania.

**IT IS FURTHER ORDERED AND DIRECTED** that the Clerk of Courts serve a copy of this Opinion upon the Commonwealth, defense counsel and the Defendant.

BY THE COURT:

MARGHERITA PATTI WORTHINGTON, P.J.

cc:    Michael Mancuso, First District Attorney
       Brandon Reish, Esq., Defense Counsel
       Stacy Britton, Defendant
       Clerk of Courts
       MPW2017-020

MONROE COUNTY, PA

2017 MAY 8 PM 1 44

CLERK OF COURTS

13